UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 09-60699-Cv-MORENO
        (06-60130-Cr-MORENO)
MAGISTRATE JUDGE P. A. WHITE

ROBERT W. PARKER,                :

          Movant,               :         REPORT OF
                                         MAGISTRATE JUDGE
v.                               :

UNITED STATES OF AMERICA,       :

          Respondent.           :
_____

Introduction

     This matter is before the Court on the movant's motion to
vacate pursuant to 28 U.S.C. §2255, attacking his conviction and
sentence for conspiracy to commit mail and wire fraud, wire fraud,
mail fraud, conspiracy to commit money laundering, money
laundering, conspiracy to impede the IRS, entered following a jury
verdict in criminal case no. 06-60130-Cr-Moreno.

     The Court has reviewed the motion (Cv-DE#1), the government's
response along with corresponding exhibits (Cv-DEs#14&15), a letter
provided by the movant (Cv-DE#17), the Presentence Investigation
Report (PSI) and all pertinent portions of the underlying criminal
file.

     Construing the movant's arguments liberally as afforded pro se
litigants pursuant to Haines v. Kerner, 404 U.S. 419 (1972), the
movant appears to raise the following claims in his §2255 motion:

     1.   The movant was denied his Sixth Amendment right to
          due process when the prosecutor elicited improper

1

irrelevant "venting" testimony from witnesses and the movant's attorney rendered ineffective assistance of counsel when he failed to object thereto. (Cv-DE#1:4).

2.    The movant was denied effective assistance of counsel and he was further denied his Sixth Amendment right to due process when his attorney failed to request a jury instruction that the government must allege and prove that the movant had no intention of performing on the contract "at the time the contract was entered into." (Cv-DE#1:8).

3.    The movant was denied his Sixth Amendment right to due process when the prosecutor deliberately misrepresented relevant and material evidence to the court and did so in front of the jury. (Cv-DE#1:10).

4.    The movant was denied effective assistance of counsel and his Sixth Amendment right to due process was denied when his attorney failed to impeach the government's key witnesses with prior inconsistent statements. (Cv-DE#1:14).

5.    The movant was denied effective assistance of counsel and his Sixth Amendment right to due process was denied when his attorney failed to subpoena clients of Parker Leasing & Financing Service who received their funding. (Cv-DE#1:17).

6.  The movant was denied effective assistance of counsel and his Sixth Amendment right to due process was denied when his attorney failed to present to the jury certain business records which would have refuted a critical government argument. (Cv-DE#1:20).

7.  The movant was denied his due process rights when the prosecutor committed misconduct by not delivering to the grand jury the subpoenaed business records of Parker Leasing & Financing Service. (Cv-DE#1:23).

8.  The movant was denied effective assistance of counsel and his Sixth Amendment right to due process was denied when his attorney failed to request a jury instruction that "the intent of the parties to a contract is determined by the plain language of the contract provided the contract is clear and unambiguous." (Cv-DE#1:25).

9.  The movant was denied effective assistance of counsel and his Sixth Amendment right to due process was denied when his attorney failed to request a jury instruction stating that when a party to a contract has a condition precedent to performance by the other party then the first party's failure to perform the condition precedent relieves the other party from performance. (Cv-DE#1:28).

10.  The movant was denied effective assistance of

3

counsel and his Sixth Amendment right to due process was denied when his attorney failed to request a jury instruction that a "mere violation of a contract is not a criminal offense" and "a breach of contract does not support a mail fraud conviction." (Cv-DE#1:78).

11. The movant was denied effective assistance of counsel and his Sixth Amendment right to due process was denied when his attorney failed to present a good faith defense. (Cv-DE#1:34).

12. The movant was denied effective assistance of counsel and his Sixth Amendment right to due process was denied when his attorney failed to provide any defense in the movant's case. (Cv-DE#1:37).

13. The movant was denied effective assistance of counsel and his Sixth Amendment right to due process was denied when his attorney failed to conduct an adequate, meaningful and reasonable pre-trial investigation into the movant's case. (Cv-DE#1:40).

14. The movant was denied a constitutional right because he was actually innocent of an offense he was convicted of when the supreme court held that movant's activities did not fall within the scope of the statute in which he was convicted. (Cv-DE#1:43).

4

15.   The movant was denied effective assistance of counsel and his Sixth Amendment right to due process was denied when his attorney failed to object to the government's inappropriate use of expert testimony. (Cv-DE#1:46).

16.   The movant was denied effective assistance of counsel and his Sixth Amendment right to due process was denied when his attorney failed to object to the variance between what was in the indictment and what was proven at trial. (Cv-DE#1:48).

17.   The movant was denied effective assistance of counsel and his Sixth Amendment right to due process was denied when his attorney failed to follow the movant's instructions to subpoena certain government witnesses to testify for the defense. (Cv-DE#1:51).

18.   The movant was denied effective assistance of counsel and his Sixth Amendment right to due process was denied when his attorney refused to obtain an expert witness to testify at the movant's trial. (Cv-DE#1:54).

19.   The movant was denied effective assistance of counsel and his Sixth Amendment right to due process was denied when his attorney failed to request a jury instruction that fraud cannot be alleged when it is based upon a misrepresentation concerning an issue covered by and contradicted by

a clause in the contract. (Cv-DE#1:57).

20.   The movant was denied effective assistance of counsel and his Sixth Amendment right to due process was denied when his attorney repeatedly used the name Parker Financing and Leasing, Inc. when he should have said Parker Leasing & Financing Service. (Cv-DE#1:60).

21.   The government committed prosecutorial misconduct when it repeatedly used the terms "The Parkers" and "Parker Leasing" to manipulate the jury and the movant was denied effective assistance of counsel when his attorney failed to object to the government's misconduct thus causing the movant severe prejudice by both, the government's misconduct and counsel's ineffective assistance. (Cv-DE#1:63).

22.   The movant was denied effective assistance of counsel and his Sixth Amendment right to due process was denied when his attorney failed to conduct a criminal background check, a civil background check, or any other type of background check to obtain information for the purpose of impeaching government witnesses. (Cv-DE#1:65).

23.   The movant was denied effective assistance of counsel and his Sixth Amendment right to due process was denied when his attorney failed to present exonerating evidence developed from a prior civil suit involving the movant and Parker Leasing

& Financing Service. (Cv-DE#1:68).

24. The movant was denied effective assistance of counsel and his Sixth Amendment right to due process was denied when his attorney failed to object to tape recordings admitted into evidence. (Cv-DE#1:70).

25. The movant was denied effective assistance of counsel and his Sixth Amendment right to due process was denied when his attorney failed to investigate whether the movant was properly indicted by at least twelve (12) members of the grand jury as required by Rule 6(f) of the Federal Rules of Criminal Procedure. (Cv-DE#1:73).

<u>Factual History</u>[1]

Parker Financing and Leasing, Incorporated (PFLI) was a Florida for profit company operated by brothers Robert and Gary Parker, and their father, Oscar Paul Parker, who is now deceased. The business purportedly engaged in the financing and leasing of commercial equipment and was located at 2961 E. Oakland Park Boulevard, Suite 3000, in Fort Lauderdale, Florida. The cooperation was dissolved in 2001, but continued to operate under PFLI and Parker Leasing and Finance Service from the above location.

Advertising their services, primarily in USA Today, Parker Leasing offered to provide capital for equipment leasing and operating capital. The ad claimed Parker Leasing was "financing

---

[1] The factual history was adduced from the "Offense Conduct" portion of the PSI.

business activities around the globe" and that the business was established in 1968. Customers responding to these ads were generally seeking funds to purchase assets/equipment, expand their business, or develop business opportunities. Customers would identify third party vendors for the purchase of assets or equipment. In some instances, the customers were interested in refinancing their assets in order to obtain working capital. Parker Leasing represented they were able to secure funding on behalf of the customers from Parker's investors and financial institutions and referred to these loan transactions as commercial equipment leases. All of the applicants were approved and were required by Parker Leasing to sign lease agreements, which required the customer to advance payments, usually first, last and a security deposit equal to one month's payment to Parker Leasing, before the funds were secured. To give the appearance that they were operating a legitimate business, Parker Leasing enlisted the services of International Quality Consultants (IQC) to do a cursory inspection of the applicant's company and the equipment. During the course of the offense, IQC was paid approximately $36,000 to perform 20 such inspections.

Once Parker Leasing received the advance fees from the customers, they failed to deliver the promised funding or to purchase any equipment. When customers began to complain, Parker Leasing stopped returning calls and/or offered excuses as to why the funding was not available. Occasionally, Parker Leasing requested additional advance fees, suggesting that the additional fees were required by the lender and would facilitate the acquisition of funds, but it never did.

There were at least 29 individuals and/or entities that responded to the Parker Leasing ad who requested funds or loans in

the amount of approximately $241,000,000. To secure these funds, the customers, who became victims of this scheme, paid approximately $4,611,452 in advance fees to Parker Leasing between 1999 and January 2005, and received nothing in return. Two of the victims received minimal refunds of approximately $66,000 of their advance fees in the amount of $293,802.

On April 26, 2005, a federal search warrant was executed at the offices of Parker Leasing. A review of the information obtained during the search, and a review of the bank records subpoenaed and/or turned over, revealed that more than $3.3 million was deposited into accounts controlled by Parker Leasing and more than $3.2 million was withdrawn. Money was moved from one account to others and more than $1 million was converted to cash by way of Parker Leasing company checks payable to cash. Other disbursements from these accounts were made to pay Parker Leasing's business expenses, which included rent, utilities, transportation costs, health and life insurance, credit card bills and other personal and business related expenses. The main expense for Parker Leasing were the office rent, advertising expenses, and the payments to IQC for the inspections. A total of $206,966.69 was seized by the government from the various bank accounts associated with Parker Leasing and the defendants in this case are subject to forfeiture.

Pursuant to their contractual agreement, Parker Leasing required a "commitment deposit" of 1% of the loan, or $150,000, which Tirol paid on June 27, 2001, via wire transfer. Thereafter, Parker Leasing required an additional $43,132.79, which represented three monthly payments of leases on property, which was sent via wire transfer to Parker Leasing's account on August 14, 2001. Robert Parker and Hope Rocillo both spoke with representatives from Tirol about what needed to be done in order for the financing to be

9

obtained. Robert Parker and Hope Rocillo were also contacted when Tirol did not receive the promised financing. They indicated to Tirol that the financing did not go through because of things Tirol did wrong and they indicated that Tirol was in default of the contract. In fact, Tirol had done all they were asked, and had done so correctly. Despite repeated demands for the return of their money, Tirol received nothing from Parker Leasing.

In May 2001, Brijendra Prasad, chairman of PRB Power PVT LTD in Hasanparthi and Yellapur, India, and Mahadev Souri contacted Parker Leasing and spoke with Hope Rocillo about securing $5 million in funding for a power project in India. Rocillo told them that Parker Leasing was interested in the project, but would need more information. In August 2001, Ashvin Zavari and Brijendra Prasad traveled to Fort Lauderdale and met with Rocillo and Annis, and later with Robert and Paul Parker. Annis picked the men up at their hotel and drove them to the office of Parker Leasing. There, Rocillo informed the men that she handled the deals and that Annis was an engineer. Annis also indicated that he and Rocillo were planning on taking over the business from Paul Parker. Rocillo indicated that the loan service for PRB Power would be several financial institutions Parker Leasing was associated with, including GE Capital, and that GE Capital had recently acquired an interest in Heller Financial and that they would be making the loan. Parker Leasing agreed to fund the power plant and the parties agreed on a final loan amount of $44,250,000.

Prasad was advised that Parker Leasing was interested in funding the project and that a $40,000 refundable deposit was required for the application to proceed. Rocillo and Annis advised the men that Parker Leasing had just completed a $310,000,000 loan to a company in Sri Lanka, but that due to the confidentiality

clause in the agreement, they could not divulge the name of the parties. Based on the representations, Zavari provided the $40,000 to Prasad who wired the money to the Parker Leasing account at Security Bank on September 10, 2001. IQC subsequently performed an inspection of the power plant location and review of the related permits and documents and indicated that it was a viable project with no known problems.

In October 2001, Prasad traveled to Fort Lauderdale and met with Rocillo, Robert and Paul Parker and provided them with copies of documents they had requested. During this meeting, Paul Parker and Rocillo spoke of their deals they were involved in, but did not provide specific details. Prasad indicated that he and his group purchased fifty-five acres for the power project and an engineer in India had approved the plan. Prasad said that Caterpillar was lined up to provide the power generation equipment necessary for the project. During the course of the next three months, a total of $460,000 was paid to Parker Leasing in advanced fees. Despite repeated assurances that Parker Leasing had secured the financing for the power project, they had not. Nor did they return any of the advance fee money to Prasad or his associates. Zavari, Prasad and Souri retained attorneys and filed suit in Federal Court in Fort Lauderdale in Case No. 02-61477-Civ-Marra. The cause in the civil case has been stayed for pending final disposition in the criminal case.

In March 2003, the owner of BioLife, Incorporated, Bennett McLawhorn, located in Birmingham, Alabama, was put in contact with Parker Leasing through a broker, Midstate Group, as he was attempting to secure $400,000 to fund the relocation and expansion of his company and to upgrade the company's equipment. McLawhorn faxed a completed application and signed the lease agreement to

Robert Parker who indicated that all of the paperwork was in order. Parker requested McLawhorn pay an advance fee of $17,600, which he had wired from his attorney's trust account to Parker Leasing's account at Security Bank on April 17, 2003. Both McLawhorn and his attorney had numerous conversations with Robert Parker and Rocillo about the funding. However, once the advance fee was paid, they did not hear from Parker Leasing or its representatives. McLawhorn finally spoke with Robert Parking and demanded his money back. Robert said he would have to speak with his father (Paul Parker) to see if he was willing to refund the money. McLawhorn never received a refund.

Curtis McCall, president of Marquee Cinemas, Incorporated, was referred by a broker to Parker Leasing to secure funding to lease movie equipment to be placed in three different movie theater locations. McCall was seeking $5.6 million in funds and, initially spoke primarily with Robert Parker, who faxed the lease agreements to McCall. Robert Parker told McCall that he would have to pay an advance fee for each of the three lease agreements he signed. McCall also spoke with Rocillo about the details of his business and his intentions for the funding. Marquee Cinemas was also reviewed by ICQ, who determined that Marquee Cinema was a legitimate company. On June 19, 2003, McCall mailed two checks in the amount of $74,279.10 and $50,399, respectively, to Parker Leasing. These checks were subsequently deposited into Parker Leasing's account at Washington Mutual Bank. Several weeks later, McCall wire transferred an additional $111,176 to Parker Leasing's account at security Bank for the final lease agreement. After the final payment was made, McCall made numerous calls to Parker Leasing to inquire about the status of the funding. Most of the time he spoke with Rocillo who made excuses as to why Robert or Paul Parker was not available. When he was able to speak with

Robert Parker, McCall was given various excuses as to why the funding had not yet come through. As in the other cases, McCall did not receive the requested funding, nor did he receive a refund of the $235,854.10 he paid in advance fees.

In November 2003, Wayne Stewart of Rome, Georgia, made contact with Parker Leasing through a series of brokers, in an attempt to secure $10.5 million in funding to purchase an adult entertainment nightclub in Atlanta. Stewart spoke with Robert Parker, who faxed a letter to Stewart outlining what Parker Leasing could provide him. In a subsequent phone conversation, Robert Parker told Stewart that if he could not secure the financing Stewart wanted, Parker Leasing would refund the advance fee money. In December 2003, Robert Parker told Stewart that he obtained the funding and the deal would close in January 2004. On January 29, 2004, Stewart wired $258,615 to Parker Leasing account at Security Bank. This amount constituted the first, second and last month's lease payments. Once Parker Leasing received the wire transfer, Robert Parker told Stewart he was having problems with the State of Florida and was trying to get funding from overseas. Over the course of the next five months, Parker Leasing continued to make promises of securing the funding Stewart sought; however, they never came through. Stewart frequently spoke with Rocillo who made excuses as to why Robert or Paul Parker were not available to speak with him. Consistent with their previous promises, Parker Leasing did not secure funding for Stewart nor did they refund any of the advance fees.

As a result of the misrepresentations and deception, Parker Leasing received advance fees totaling $4,611,452. Moreover, some of the defendants diverted the money obtained in the fraud to nominee bank accounts. They did so in an effort to prevent the IRS

from ascertaining and assessing their true income. They structured their business affairs primarily in cash disbursements and did not maintain appropriate records or report the income to the IRS. Robert Parker diverted funds to Rocillo utilizing the nominee bank account of Atlas Consulting and Finance Group at American National Bank. This was a company incorporated in the State of Florida on September 21, 2001. According to available records, Edward Jason Annis and Hope Rocillo were the officers of Atlas Consulting and Finance Group, which listed its business address as 2805 E. Oakland Park Boulevard in Fort Lauderdale, Florida. Rocillo used some of these funds to pay for the personal expenses of she and her boyfriend, Annis. Rocillo also received a large portion of her share of the fraudulent proceeds, approximately $121,000, in the form of cash, which she deposited into this account.

Gary Parker had an account in the name of Parker Leasing Service at First Tennessee Bank, which received deposits of approximately $1 million in fraudulent funds. Robert Parker handled the remaining accounts established under the Parker Leasing business.

Robert Parker failed to file personal income tax returns for the years 2000 through 2004 on income of at least $1.2 million. Based on the records available, he failed to report income of more than $10,000 in each of these years that was derived from criminal activity. The tax due and owing on this income is at least $380,000. Gary Parker failed to file personal income tax returns for the years 2000 through 2004 on income of at least $1.2 million. Based on the records available, he failed to report income of more than $10,000 in each of these years that was derived from criminal activity. The tax due and owing on this income is at least $328,000. Hope Rocillo failed to file personal income tax returns

14

for the years 2000 through 2002 on income of at least $179,000. Based on the records available, she failed to report income of more than $10,000 in 2000 and 2001 that was derived from criminal activity. The tax due and owing on this income is at least $69,000.

Robert and Gary Parker and Hope Rocillo paid Parker Leasing's rent, hired and paid IQC to conduct site visits and purchased advertising from USA Today with the proceeds of the fraud. These expenses, which total approximately $430,000, represent the money used by the defendants to promote their specified unlawful activity.

Following Rocillo's arrest for the instant offense, she provided details to the authorities regarding her involvement. Neither Robert nor Gary Parker provided post-arrest statements.

## Procedural History

The procedural history of the underlying criminal case reveals that on July 11, 2006, the federal grand jury returned a Superseding Indictment charging the movant with conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. §§371, 1341 and 1343 (Count 1); committing substantive wire fraud (Counts 2-35 and mail fraud (Counts 36-37), in violation of 18 U.S.C. §§1343 and 1341, respectively; conspiring to launder money, in violation of 18 U.S.C. §1956(h) (Count 38); committing substantive money laundering, in violation of 18 U.S.C. §1956(a)(1)(A)(i) (Counts 39-50), and participating in a "Klein" conspiracy by evading income taxes, in violation of 18 U.S.C. §371 (Count 51); income tax evasion, in violation of 26 U.S.C. §7201 (Counts 52-56). (Cr-DE#57).

Thereafter, on April 30, 2007, the movant proceeded to trial.

15

(Cr-DE#211). Then, on May 10, 2007, the movant was convicted of conspiracy to commit wire fraud and mail fraud (Count 1), wire fraud (Counts 2-24,28, and 31-34), mail fraud (Count 36), conspiracy to launder money (Count 38), money laundering (Counts 39-50), the Klein conspiracy to evade income taxes (Count 51) and income tax evasion (Counts 52-56). (Cr-DE#240).[2]

A PSI was prepared in anticipation of sentencing wherein the probation officer determined the movant's base offense level was 7. (PSI¶31-32). However, because the movant was found responsible for losses totaling $4,611,452, his offense level was increased by 18 levels. (PSI¶33). Moreover, because the offense involved 10 or more but less than 50 victims, and was committed through mass marketing, his offense level was increased by two. (PSI¶34). Likewise, because the offense involved sophisticated means, the offense level was increased by two more levels. (PSI¶35). Finally, because the movant was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive, his base offense level was increased by four levels. (PSI¶37). Accordingly, his base offense level was set at 33. (PSI¶42).

The probation officer further determined the movant had a total of zero criminal history points and a criminal history category of I. (PSI¶45). Based on a total offense level of 33 and a criminal history category of I, the movant's guideline range was set between 135 to 168 months imprisonment. (PSI¶74).

On July 19, 2007, the movant appeared for sentencing, wherein the District Court sentenced him to 60 months imprisonment as to Counts 1, 51-56, 135 months imprisonment as to Counts 2-24, 28, 31-

---

[2]Counts 25-27, 29-30, 35 and 37 were voluntarily dismissed. (Cr-DE#308:1067-68).

34, 36, 38-50, all counts to run concurrently, followed by 3 years of supervised release, restitution in the amount of $1,824,137.00 and a special assessment of $4,900.00. (Cr-DEs#273&279). The Clerk entered judgment on July 23, 2007. (Cr-DE#279). A timely notice of appeal was filed. (Cr-DE#276). On December 12, 2008, the Eleventh Circuit Court of Appeals, per curiam, in an unpublished opinion affirmed the movant's conviction and sentence. United States v. Parker, et.al, 302 Fed. Appx. 889, 2008 WL 5205467 (11th Cir. 2008). Specifically, the Eleventh Circuit held that the evidence was sufficient to support the movant's convictions, the district court did not err in imposing sophisticated means and leadership role enhancements pursuant to the Sentencing Guidelines and the movant's 135-month sentence was reasonable. Id. It appears the movant did not petition for writ of certiorari. The judgment of conviction in the underlying criminal case became final at the latest on March 12, 2009, ninety days after the judgment was issued on direct appeal,[3] when time expired for seeking certiorari review with the Supreme Court. The motion was timely filed less than one year later on May 6, 2009. (Cv-DE#1).

Discussion of Claims

As will be demonstrated in more detail infra, the movant is

---

[3]The Supreme Court has stated that a conviction is final when a judgment of conviction has been rendered, the availability of appeal exhausted, and the time for a petition for certiorari elapsed or a petition for certiorari finally denied. Griffith v. Kentucky, 479 U.S. 314, 321, n.6 (1986); accord, United States v. Kaufmann, 282 F.3d 1336 (11th Cir. 2002). Once a judgment is entered by a United States court of appeals, a petition for writ of certiorari must be filed within 90 days of the date of entry. The 90 day time period runs from the date of entry of the judgment rather than the issuance of a mandate. Sup.Ct.R. 13; see also, Close v. United States, 336 F.3d 1283 (11th Cir. 2003).

not entitled to vacatur on any of the claims presented.[4] When viewing the evidence in this case in its entirety, the alleged errors raised in this collateral proceeding, neither individually nor cumulatively, infused the proceedings with unfairness as to deny the petitioner a fundamentally fair trial and due process of law. The movant therefore is not entitled to habeas corpus relief. See Fuller v. Roe, 182 F.3d 699, 704 (9th Cir. 1999)(holding in federal habeas corpus proceeding that where there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation), overruled on other grounds, Slack v. McDaniel, 529 U.S. 473, 482 (2000). See also United States v. Rivera, 900 F.2d 1462, 1470 (10th Cir. 1990)(stating that "a cumulative-error analysis aggregates only actual errors to determine their cumulative effect."). Contrary to the movant's apparent assertions, the result of the proceedings were not fundamentally unfair or unreliable. See Lockhart v. Fretwell, 506 U.S. 364, 369-70 (1993).

Specifically, the movant challenges counsel's effectiveness.[5]

_____

[4] Briefly, the evidence against the movant was more than sufficient to support his conviction. The movant has not shown that the result of the trial proceedings, appeal, or sentencing would have been affected had counsel proceeded differently. In other words, no deficient performance or prejudice pursuant to Strickland has been established arising from any of the claims raised in this collateral proceedings, nor has a denial of due process been demonstrated. To the contrary, it is clear after independent review of the record that the movant received a fair criminal proceeding, and that no constitutional violations occurred. Consequently, he has failed to demonstrate that he is entitled to habeas corpus relief in this collateral proceeding.

[5] In all of the claims wherein the movant argues ineffective assistance of counsel, he also raises claims alleging violations of his Sixth Amendment right to due process. These claims, alone, would normally be procedurally barred, however it appears the movant argues that counsel's ineffectiveness constitutes the "cause" for the movant's procedural default. Although counsel's ineffectiveness may satisfy the "cause" exception to a procedural bar, it will only do so counsel's deficiency resulted in a prejudice, thus affecting the outcome of his case. However, because the movant's allegations of ineffective assistance of counsel are without merit, his Sixth Amendment claims are without merit as well.

18

Ineffective assistance of counsel claims are subject to the two-part test enunciated in Strickland v. Washington, 466 U.S. 668 (1994), which is not a favorable standard to the movant. See Massaro v. United States, 538 U.S. 500, 505 (2003). To prevail on a claim of ineffective assistance, a movant must demonstrate both that (1) counsel's performance was deficient, meaning that it fell below an objective standard of reasonableness; and (2) the deficient performance prejudiced the defendant. Chandler v. United States, 218 F.3d 1305, 1312-13 (11th Cir. 2000)(en banc), cert. denied, 531 U.S. 1204 (2001); Strickland v. Washington, 466 U.S. 668 (1984). Moreover, a habeas court's review of a claim under the Strickland standard is "doubly deferential." Knowles v. Mirzayance, ____ U.S. ____, 129 S.Ct. 1411, 1418, 173 L.Ed.2d 251 (2009). In deciding whether counsel's performance was deficient, judicial scrutiny is "highly deferential" and requires us to "'indulge [the] strong presumption that counsel's performance was reasonable and that counsel made all significant decisions in the exercise of reasonable professional judgment.'" Id. at 1314 (quoting Strickland v. Washington, 466 U.S. at 689-90.

When assessing a lawyer's performance, "[C]ourts must indulge the strong presumption that counsel's performance was reasonable and that counsel made all significant decisions in the exercise of reasonable professional judgment." Chandler v. United States, 218 F.3d 1305 (11th Cir. 2000)(en banc), cert. denied, 531 U.S. 1204 (2001). The court's role in reviewing ineffective assistance of counsel claims is not to "grade a lawyer's performance; instead, [the court] determine[s] only whether a lawyer's performance was within "the wide range of professionally competent assistance." Van Poyck v. Florida Dept. of Corrections, 290 F.3d 1318, 1322 (11th Cir.), cert. denied, 537 U.S. 812 (2002), quoting, Strickland v. Washington, 466 U.S. 668, 690. Review of counsel's conduct is to

be highly deferential. Spaziano v. Singletary, 36 F.3d 1028, 1039 (11th Cir. 1994), and second-guessing of an attorney's performance is not permitted. White v. Singletary, 972 F.2d 1218, 1220 (11th Cir. 1992)("Courts should at the start presume effectiveness and should always avoid second-guessing with the benefit of hindsight."); Atkins v. Singletary, 965 F.2d 952, 958 (11th Cir. 1992). A claim of ineffective assistance is a mixed question of law and fact. Strickland, 466 U.S. at 698.

The Eleventh Circuit will not "second-guess counsel's strategy." Chandler, 218 F.3d at 1314, n.14. Strategic choices, even those "made after less than complete investigation," are evaluated for their reasonableness and "counsel's reliance on particular lines of defense to the exclusion of others--whether or not he investigated those other defenses--is a matter of strategy and is not ineffective unless the petitioner can prove the chosen course, in itself, was unreasonable." Chandler, 218 F.3d at 1318 (quoting Strickland, 466 U.S. at 690-91).

The courts "are not interested in grading lawyers' performances;" but rather, "are interested in whether the adversarial process at trial . . . worked adequately." Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994)(quotation marks omitted). To be unreasonable, the performance must be such that "no competent counsel would have taken the action that [the petitioner's] counsel did take." Grayson v. Thompson, 257 F.3d 1194, 1216 (11th Cir. 2001)(emphasis omitted). In other words, "[e]ven if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." Rogers v. Zant, 13 F.3d at 386.

Under the second prong of the test set forth in Strickland, the movant can be said to have been prejudiced by counsel's performance only if there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Rather, the movant must demonstrate that "there is a reasonable probability that, absent [counsel's] errors, the jury would have had a reasonable doubt regarding [his] guilt." Blackburn v. Foltz, 828 F.2d 1177, 1186 (6th Cir. 1987), cert. den'd, 485 U.S. 970 (1988), see also, Montgomery v. Petersen, 846 F.2d 407, 416 (7th Cir. 1988).

However, it is well-settled that tactical or strategic choices by counsel cannot support a collateral claim of ineffective assistance. United States v. Costa, 691 F.2d 1358 (11th Cir. 1982); Coco v. United States, 569 F.2d 367 (5th Cir. 1978). Even if such a decision in retrospect appears incorrect, it can constitute ineffective assistance only "if it was so patently unreasonable that no attorney would have chosen it," Adams v. Wainwright, 709 F.2d 1443, 1445 (11th Cir.), cert. denied, 464 U.S. 1663 (1984), or if the petitioner can demonstrate a "reasonable probability that the verdict [otherwise] would have been different." Kimmelman v. Morrison, 477 U.S. 365, 375 (1986).

Decisions whether to call a particular witness or cross-examine certain witnesses are generally questions of trial strategy. See United States v. Costa, 691 F.2d 1358 (11th Cir. 1982). However, where counsel failed to investigate and interview promising witnesses, and therefore "ha[s] been given no reason to believe they would not be valuable in securing [defendant's] release," counsel's inaction constitutes negligence, not trial

strategy. <u>Workman v. Tate</u>, 957 F.2d 1339, 1345 (6th Cir. 1992)(<u>quoting</u> <u>United States ex rel. Cosey v. Wolff</u>, 727 F.2d 656, 658 n.3 (7th Cir. 1984)). Nevertheless, strategic choices made after thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable. <u>Strickland v. Washington</u>, 466 U.S. at 690-91.

Moreover, **claims 3 and 7,** as noted above, could have been, but were not raised on direct appeal. Because the claims were not raised on direct appeal, they are procedurally barred from review in this collateral proceeding unless the movant can show cause for the default and actual prejudice, <u>Wainwright v. Sykes</u>, 433 U.S. 72 (1977), or a fundamental miscarriage of justice, <u>Engle v. Isaac</u>, 456 U.S. 107 (1982). Constitutionally ineffective assistance of counsel can constitute cause. <u>See</u> <u>Holladay v. Haley</u>, 209 F.3d 1243, 1253 (11th Cir. 2000), <u>citing</u>, <u>Hollis v. Davis</u>, 941 F.2d 1471, 1476 (11th Cir.1991), <u>citing</u> <u>Murray v. Carrier</u>, 477 U.S. 478, 488 (1986)); <u>see also</u>, <u>United States v. Breckenridge</u>, 93 F.3d 132 (4th Cir. 1996). Attorney error, however, does not constitute cause for a procedural default unless it rises to the level of ineffective assistance of counsel under the test enunciated in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984); <u>Murray v. Carrier</u>, 477 U.S. 478, 488 (1986).

The movant, in this collateral proceeding, neither shows cause for failing to raise the issues on direct appeal nor does he show any actual prejudice as a result therefrom. Accordingly, the movant's claims are without merit and as such, they will not be addressed on the merits.[6]

_____

[6] Although the claims are procedurally barred, the government, in its response, has addressed said claims on the merits and because the government's analysis thereof is correct, the analysis is hereby adopted as part of this report and recommendation.

In **claim 1**, the movant asserts he was denied his Sixth Amendment right to due process when the prosecutor elicited improper irrelevant "venting" testimony from witnesses and the movant's attorney rendered ineffective assistance of counsel when he failed to object thereto. (Cv-DE#1:4). He further argues that such testimony was prejudicial in that the government designed it to evoke the passions of the jurors especially when the government's evidence was not overwhelming. (Cv-DE#1:6).

Despite the movant's allegations, he fails to cite any authority establishing that presentation of impact suffered by the victims by way of testimony during the guilt phase of his non-capital trial was impermissible. However, even if it is determined that said evidence was impermissible, the claim remains without merit.

The movant fails to explain how the introduction of such testimony was either illegal or what objections counsel should have made thereto. Likewise, he fails to demonstrate that had counsel made any objections to the witnesses' testimonies, the court not only would have sustained the objections, but that a different outcome would have resulted. Thus, he fails to demonstrate prejudice as a result of counsel failing to object to the witnesses' testimonies. Under these circumstances, the movant is therefore entitled to no relief on this claim.

Moreover, defense counsel did in fact object to the testimony regarding collateral consequences suffered by government witness Schilling. (Cr-DE#306:484). Although other witnesses also testified that they suffered monetary losses as a direct result of the movant

and his co-defendant's fraudulent activities,[7] given the overwhelming evidence adduced at trial implicating him, no showing has been made that had counsel challenged the introduction of the witnesses' testimonies, the result thereof would have resulted in a not guilty verdict. Consequently, the movant cannot establish prejudice arising from counsel's failure to pursue this claim.

Moreover, even if it is found that defense counsel was deficient in failing to object to the witnesses' testimonies with respect to the collateral damages suffered, the court on its own intervened when the government attempted to elicit such testimony from government witness Shilling, the court stated:

> THE COURT: You want to talk about that, but it's a criminal case and it has nothing to do with whether they are guilty or not for purposes of the jurors. That's the reason I sustained the objection.
>
> If I let you do it, you would have to come back a year from now. Do you want to do that?
>
> THE WITNESS: No, Your Honor.
>
> THE COURT: Do you understand my ruling?
>
> * * * * *
>
> THE COURT: I'm not trying to prevent you from venting, but we don't do venting in court, we just deal with the facts that are absolutely necessary for the jurors to determine whether there's sufficient evidence of guilt of the defendants' accusations.

(Cr-DE#306:484). As is evident from the court's explanation, the court cured any deficiency counsel may have committed by clearly informing the jury that such testimony was irrelevant with

---

[7]See Cr-DE#304:88; Cr-DE#305:251-255; Cr-DE#305:305-307; Cr-DE#306:400-401,414-415, 452-454.

determining guilt or innocence. Towards the end of trial, the court went on to instruct the jury that they must not be influenced by either sympathy or prejudice against the defendants or the government. (Cr-DE#232, Jury Instruction No.2:2).

Likewise, as is evident from a review of the trial transcripts, even if it was improper for the jury to have heard the collateral damages suffered by the witnesses, the government, nonetheless, proved every element of the offenses as charged in the superseding indictment. Under these circumstances, no deficient performance or prejudice has been established pursuant to Strickland, supra, and the movant is therefore entitled to no relief on the claims.

In **claims 2**, **8, 9, 10 and 19** the movant asserts he was denied effective assistance of counsel and he was further denied his Sixth Amendment right to due process when his attorney failed to request certain jury instructions. Specifically, counsel should have requested the following instructions: (1) the government must allege and prove that the movant had no intention of performing on the contract "at the time the contract was entered into" (Cv-DE#1:8); (2) "the intent of the parties to a contract is determined by the plain language of the contract provided the contract is clear and unambiguous" (Cv-DE#1:25); (3) when a party to a contract has a condition precedent to performance by the other party then the first party's failure to perform the condition precedent relieves the other party from performance (Cv-DE#1:28); (4) a "mere violation of a contract is not a criminal offense" and (5) "a breach of contract does not support a mail fraud conviction," (Cv-DE#1:78); and (6) fraud cannot be alleged when it is based upon a misrepresentation concerning an issue covered by and contradicted by a clause in the contract. (Cv-DE#1:57). In each of the foregoing

claims, the movant has failed to demonstrate that he suffered any prejudice from counsel's failure to request the instructions proffered.

As the government correctly points out, in <u>United States v. Elso</u>, the Eleventh Circuit Court of Appeals, with respect to whether a particular jury instruction should be utilized noted:

> There is no question that a defendant is entitled to a jury instruction that conveys his theory of defense, 'as long as it has some basis in the evidence and has legal support.' <u>United States v. Nola</u>, 223 F.3d 1311, 1313-14 (11th Cir. 2000). Reversal is appropriate 'when we are left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations,' <u>id.</u> at 1314 which occurs 'only if the rejected instruction was substantially correct, the actual charge to the jury did not substantially cover the proposed instruction, and the failure to give it substantially impaired the defendant's ability to present an effective defense,' <u>United States v. Zlatogur</u>, 271 F.3d 1025, 1030 (11th Cir. 2001)(<u>quoting</u> <u>United States v. Orr</u>, 825 F.2d 1537, 1542 (11th Cir. 1987).

<u>United States v. Elso</u>, 422 F.3d 1305 (11th Cir. 2005), <u>cert. den'd</u>, 547 U.S. 1131 (2006). Defense counsel's failure to give the proffered instructions did not substantially impair the movant's ability to present an effective defense because the proffered instructions were not substantially correct since they failed to have some basis in the evidence or legal support. Under these circumstances, no deficient performance or prejudice has been established pursuant to <u>Strickland</u>, <u>supra</u>, and the movant is therefore entitled to no relief on the claims.

Specifically, with respect to **claim 2**, the movant argues that a jury instruction to the extent the government must allege and prove that the movant had no intention of performing on the

contract at the time of the contract was entered into should have been given. Moreover, he further argues that Eleventh Circuit law in relation to this instruction is well-established that in order to constitute a fraud conviction, it must be alleged and proven that the defendant must have possessed the requisite intent not to perform on the contract "at the time the contract was entered into" and not at some other time after the contract was signed. (Cv-DE#1:8). The movant then goes on to say that counsel's failure to request such an instruction could not be deemed strategic. (Id.).

First, the movant fails to cite case law in support thereof, therefore failing to demonstrate that his proffered instruction has legal support. Moreover, aside from the vague assertion that "there is a reasonable probability that the jury would have had a reasonable doubt respecting Movant's guilt," had the proffered instruction been provided, he nonetheless fails to demonstrate that he suffered prejudice as a result therefrom. Accordingly, this claim is without merit.

Moreover, with respect to **claim 8**, the movant argues a jury instruction to the effect that "the intent of the parties to a contract is determined by the plain language of the contract is clear and unambiguous," should have been given. The movant again makes similar arguments as to those raised with respect to **claim 2.** First, he argues the law of the Eleventh Circuit is well-established in the State of Florida, where the contracts were executed. Second, he argues that in contract law in general, the intent of the parties to the contract is determined by the plain language of the contract, so long as the contract language is clear and unambiguous.

Again, the movant's claim fails for similar reasons set forth

with respect to **claim 2**. The movant has failed to proffer any law in support of his argument and once again, aside from his vague assertion that he suffered prejudice, he fails to demonstrate how counsel's failure in requesting such an instruction, affected the outcome of his trial. Under these circumstances, no deficient performance or prejudice has been established pursuant to Strickland, supra, and the movant is therefore entitled to no relief on the claims.

With respect to **claim 9**, the movant contends counsel should have requested a jury instruction to the extent that "when a party to a contract has a condition precedent to performance by the other party then the first party's failure to perform the condition precedent relives the other party from performance." (Cv-DE#1:28). In support of this claim, the movant argues because the victim/witnesses on cross-examination acknowledged that they failed to comply with the contract, they therefore were aware that any initial payment was not refundable. (Id.). For the same reasons set forth with respect to **claims 2 and 8**, the movant, aside from vague assertions, fails to provide any law in support of his argument and he fails to demonstrate how he suffered prejudice as a result thereof. Under these circumstances, no deficient performance or prejudice has been established pursuant to Strickland, supra, and the movant is therefore entitled to no relief on the claims.

Likewise, with respect to **claim 10**, the movant argues counsel should have requested a jury instruction to the extent that a "mere violation of a contract is not a criminal defense and a breach of contract does not support a mail fraud conviction." (Cv-DE#1:31). The movant further argues that although all of the victim/witnesses testified that they failed to perform the condition precedent of their respective contract, the government nevertheless argued that

28

the movant's conduct constituted a scheme to defraud. (<u>Id.</u>). According to the movant, had the jury been instructed accordingly, they would not have found him guilty for any criminal offense. (<u>Id.</u>).

In support of his argument, the movant cites to <u>United States v. Chandler</u>, 388 F.3d 796, 803 (11th Cir. 2004), wherein the defense, and the government did not object to, giving the jury an instruction that the breach of contract does not support a mail fraud conviction. <u>Chandler</u>, 388 at 803. ("The defendants requested several jury instructions. First, they asked the court to instruct the jury that mere violation of a contract is not a criminal offense. The government agreed that breach of contract does not support a mail fraud conviction. The court agreed to give the instruction."). Notwithstanding, the movant's arguments pursuant to <u>Chandler</u> are misplaced. A review of <u>Chandler</u>, clearly shows that the Eleventh Circuit Court's decision does not stand for the proffered proposition. <u>Id.</u> Rather, the language the movant relies upon to support his claim is simply the Eleventh Circuit's recounting of the criminal trial history, and is not part of the Court's holding. <u>Id.</u> Under these circumstances, no deficient performance or prejudice has been established pursuant to <u>Strickland</u>, <u>supra</u>, and the movant is therefore entitled to no relief on the claims.

Similarly, with respect to **claim 19**, the movant argues counsel was deficient in failing to request a jury instruction to the extent that "fraud cannot be alleged when it is based upon a misrepresentation concerning an issue covered by and contradicted by a clause in the contract." (Cv-DE#1:57). According to the movant, he states that each witness/victim testified that they were aware they did not comply with the terms of the contract when they

remitted their deposits. This claim, for the same reasons set forth with respect to **claims 2, 8, 9, and 10**, must fail.

The failure to provide case law in support of the foregoing instruction clearly demonstrates the lack of legal support for the movant's claim. Moreover, aside from the vague assertion that had the proffered instruction been provided the outcome of his case would have been different, he nonetheless fails to demonstrate that he suffered prejudice as a result therefrom. Accordingly, this claim is without merit.

In **claims 4, 5, 6 and 17**, the movant asserts he was denied effective assistance of counsel and his Sixth Amendment right to due process was denied when his attorney failed to impeach the government's key witnesses with prior inconsistent statements (Cv-DE#1:14), failed to subpoena clients of Parker Leasing & Financing Service who received their funding (Cv-DE#1:17), failed to present to the jury certain business records which would have refuted a critical government argument (Cv-DE#1:20) and failed to follow the movant's instructions to subpoena certain government witnesses to testify for the defense. (Cv-DE#1:51). Notwithstanding the movant's arguments, his claims are devoid of any facts or law supporting that counsel failed to subject the government's case to meaningful adversarial testing. Moreover, in this collateral proceeding, the movant fails to demonstrate how he was prejudiced as a result thereof. As such, under these circumstances, the movant's claims are without merit.

Specifically, with respect to **claim 4**, the movant contends that his attorney failed to impeach the government's key witness, Hope Rocillo, by way of prior inconsistent statements. (Cv-DE#1:14). According to the movant, when Rocillo was first arrested,

she provided the FBI with a statement stating that she did not think she ever did anything wrong. (Id.). Then, in exchange for a favorable plea agreement, she testified against the movant. (Id.). Thus, the movant argues, the statements made to the FBI were prior sworn statements made by a key witness which could have been used by counsel during cross-examination. (Id.). The movant further argues because Rocillo's testimony was critical to the government's case, her impeachment was critical for his defense. (Id.).

First, the movant fails to list which prior statements were inconsistent with Rocillo's testimony during trial, which could have been for impeachment purposes. His vague allegations of a possible impeachment is insufficient to warrant the movant any relief on this claim.

Second, the movant in effect is seeking to introduce extrinsic evidence of Rocillo's prior inconsistent statement by way of the FBI agent's summary. According to Fed.R.Evid. 613(b), "[e]xtrinsic evidence of a prior inconsistent statement made by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same . . . ." Pursuant to the Jencks Act,[8] "non-verbatim summaries of a witness' prior oral statements are excluded from mandatory production because it would be 'grossly unfair to allow the defense to use statements to impeach a witness which could not fairly be said to be the witness' own rather than the production of the investigator's selections, interpretations, and interpolations.'" United States v. Saget, 991 F.2d 702 (11th Cir. 1993); citing Palermo v. United States, 360 U.S. 343, 350 (1959). See also United States v. De La Cruz Suarez, __ F.3d __, 2010 WL 1223884 (11th Cir. 2010).  Accordingly, Rocillo could not be

---

[8] 18 U.S.C. §3500.

impeached with a third party's characterization or interpretation of a prior oral statement unless she subscribed to or otherwise adopted the statement as her own, which the movant has failed to demonstrate. Thus, counsel was not deficient in failing to impeach Rocillo using statements summarized therein.

Moreover, with respect to **claims 5, 6 and 17**, the movant argues counsel was ineffective when he failed to subpoena clients of Parker Leasing & Financing Service who received funding therefrom to testify on his behalf at trial (Cv-DE#1:17), present business records of Parker Leasing & Financing Service to refute the government's argument, (Cv-DE#1:20) and failed to follow the movant's instructions to subpoena certain government witnesses to testify for the defense. (Cv-DE#1:51).

According to the movant, presentation of such testimony would have refuted the government's main argument that the movant lacked the intent to fund the lease transaction which was the subject of the indictment. (Cv-DE#1:17). The movant further asserts that he informed his attorney that Parker Leasing & Financing Service had been in business for 38 years and has been responsible for funding many transactions during that time and suggested to counsel that some of these people should be subpoenaed so they could testify regarding their funded transactions. (Id.). Moreover, the movant argues he informed his attorney that prior to his father's death, his father, O. Paul Parker, delivered 13 boxes of business records to his attorney in response to a federal grand jury subpoena to show that normal business records for Parker Leasing & Financing Service existed. (Cv-DE#1:20). Likewise, he argues it would have assisted his defense greatly if counsel subpoenaed the victims who testified as government witnesses for additional questioning. (Cv-DE#1:52). Specifically, he wanted to use the government's witnesses

to call into question Rocillo's credibility. (Id.).

Despite not providing any facts, aside from self-serving allegations, the movant fails to provide any law in support of his arguments. The movant also fails to name the clients or government witnesses counsel should have subpoenaed and what testimony, if any, they would have proffered. Rather, the movant vaguely asserts that numerous clients received the funded transaction and that subpoenaing government witnesses would have created doubt upon Rocillo's credibility without providing any detail thereof. Moreover, the movant fails to explain what the business records contained and how the existence thereof refuted the evidence presented by the government during trial. Bare and conclusory allegations of ineffective assistance of counsel which contradict the existing record and are unsupported by affidavits or other indicia of reliability, are insufficient to require a hearing or further consideration.

Moreover, even if evidence was presented that transactions were in fact funded, no showing has been made in this collateral proceeding that the outcome of the guilt phase portion of the movant's trial would have been different, especially in light of the facts adduced at trial. Clearly, the movant's allegations when viewed in light of the evidence adduced at trial, would not have affected the outcome of his criminal proceeding.

Moreover, Rocillo's testimony during trial corroborates the government's position that the movant never had the intention to fund any of the deals. (Cr-DE#307:731,735,736,751,760,772). At trial Rocillo testified that since 1999, when she began working at Parker Leasing, until she met with the "Indians," she never saw any deals funded. (Cr-DE#307:731). Her testimony further revealed that

33

when questioned by Dr. Souri whether receiving the funds within 48 hours was possible, Rocillo lied to him and said yes knowing full well that fulfilling the lease contract would be difficult, in light of the "letter of credit" requirement, within the time period he requested. (<u>Id.</u>:735). Rocillo was fully aware she mislead Dr. Souri and she did so because she wanted him to wire in the funds. (<u>Id.</u>:736). Although Rocillo knew the deals were going unfunded, she nevertheless continued influencing people to "sign up with Parker Leasing and wire their money." (Id.:738).

Beginning in 2001, while Rocillo worked with Parker Leasing, she testified that every deal that came in failed. (Cv-DE#307:751). When customers called requesting to speak with Robert Parker, with Parker's express permission, Rocillo made misrepresentations as to his whereabouts. (<u>Id.</u>:752). Private investors neither visited the offices of Parker Leasing, nor was a meeting ever conducted on their premises nor were Parker Leasing's files ever reviewed by investors. (<u>Id.</u>:760). Likewise, there was nothing in the office from any legitimate lending company or from companies that funded any deals. (<u>Id.</u>). Rocillo further explained that she pleaded guilty because she "mislead people into thinking that they could get their funding from a company when [she] knew that they were not going to get their funding." (<u>Id.</u>:772).

Moreover, during sentencing, the movant made statements consistent with Rocillo's testimony. (Cr-DE#300:44). Specifically, the movant admitted that everything was fraudulent from the beginning and there was never any intention to fund any of the deals. (<u>Id.</u>). Moreover, counsel, along with the movant, also made various representations concerning the movant's culpability and after-the-fact acceptance of responsibility:

MR. BARZEE: I think it's important that I object at the fact that Robert Parker allegedly received $1.3 million. That's incorrect.

THE COURT: Well, you think the whole trial achieved an incorrect result. That's what happens in most sentencings after a jury verdict.

MR. BARZEE: No, I'm not sure that that's true. I think the jury probably found the facts correctly as they were alleged. I mean, Robert Parker admits that. He admits that this was a fraudulent activity from the beginning. He admits every single charge that the government proved up in the indictment. He admits that was all done fraudulently. He admits that there was no intention to ever fund these deals. He admits that he lied to the people on the telephone. He admits it was a complete and total scam, absolutely.

THE COURT: So why did we have a trial?

MR. BARZEE: Well, that's a good question. And I think it's a complicated answer. In part, I think it had to do with advice that Robert was receiving from someone other than me and a mistaken belief that he could hide behind the contract.

THE COURT: All right.

MR. BARZEE: Which he now understands was, not only wrong factually, but wrong legally.

(Cr-DE#300:24).

THE COURT: Mr. Barzee, what say you on behalf of your client?

MR. BARZEE: Your Honor, I think the first and probably most important thing to say is that Robert Parker admits the responsibility for committing these crimes.

THE COURT: Where do I find that, at the trial?

MR. BARZEE: No, not at the trial.

THE COURT: At the presentence investigation report?

35

MR. BARZEE: Purposefully not at the presentence investigation report by agreement with the government.

THE COURT: So where do I hear that?

MR. BARZEE: Right now.

THE COURT: From you?

MR. BARZEE: Yes.

THE COURT: Well, I'm not sentencing you.

MR. BARZEE: I understand that.

THE COURT: Okay.

MR. BARZEE: He has also informed the government of that. I think the government had a correction or addendum or statement that they wanted to make about that issue as well.

THE COURT: Mr. Bober?

MR. BOBER: There's no statement that I want to make. Mr. Barzee and the government obviously have a disagreement as to the value of the information that Robert Parker provided to us. I think in fairness, we agreed we will leave it at that. There's a disagreement over what, if any, value. That's why I didn't mention it.

THE COURT: Okay.

MR. BARZEE: I believe that the government was also going to indicate to the Court that Mr. Parker is continuing to meet with the government.

THE COURT: That's between Mr. Parker through you and the prosecutor. If there's a 5K1, this would be the time. If there's going to be a Rule 35, you got a year.

MR. BOBER: There isn't, Your Honor, and it's not foreseeable. So there's just a disagreement on that issue, I think is the fairest way to leave it so that nothing else erupts.

THE COURT: Anything else you want to say on behalf of your client?

36

MR. BARZEE: I'm a little disappointed in what the government just said because it wasn't my understanding as to what was agreed upon. And maybe Tom Lanigan can explain to the Court as to what the agreement was. Suffice it to say that Robert Parker has after the verdict, admittedly after the verdict, completely and totally admitted his responsibility in this offense.

THE COURT: To prosecutors or agents.

MR. BARZEE: And to the Court right now through me.

THE COURT: To the Court, I haven't been with you all at whatever meetings you all had.

MR. BARZEE: No, right now, right now he is telling the Court that this was a fraud from day one, that there was no intention to fund these deals, that he knew that he was engaged in fraudulent activity from day one.

THE COURT: That kind of would take care of the appeal, wouldn't it?

MR. BARZEE: Yes, it would. It would. I mean, this is what Robert Parker wants to tell the Court and wants me to tell the Court.

THE COURT: All right.

MR. BARZEE: I mean, this is - -

THE COURT: I'm going to give him a chance to say whatever he wants, including that, if that's what he wants to do.

MR. BARZEE: Well, Your Honor, he's made it clear to me - - excuse me one second.

THE COURT: No, but he's got to make it clear to me. I'm the one who's sentencing him. I'm not compelling him or even advising him or inviting him. I'm merely allowing him to say whatever he wants.

MR. BARZEE: He has indicated to the government and indicated to me that he, quote/unquote, wants to come clean and intends to do so.

(Cr-DE#300:29-32).

37

THE COURT: Well, lets hear from him. What do you think? Mr. Robert Parker, what do you wish to say before I sentence you, sir?

DEFENDANT ROBERT PARKER: Just everything Mr. Barzee said is correct. We discussed this earlier today and have been since the trial was over.

THE COURT: I don't want to put you in a situation where you want to admit to certain things because you have a right to remain silent. Even after a trial, you have a right to appeal. You are represented by competent counsel with whom you have expressed satisfaction before. Nor am I telling you that you may get any credit for accepting responsibility at this late stage. So I want you to think carefully, but it's up to you to say whatever you want before you are sentenced with those warnings that I have given you indicating that if you admit all these allegations, you can still appeal. But if you get a new trial for some reason, this can be used against you.

And it would be a much easier trial. It would almost be perhaps some people might think a waste of time because it you admit it in court having the advice of competent counsel with whom you expressed satisfaction, it seems like it would probably be admitted, that statement, at a subsequent trial.

So you have to think carefully after going to trial as to what you want to say when some facts like criminal intent have been disputed. Do you understand what I'm saying? Let the record reflect that he's talking - -

DEFENDANT ROBERT PARKER: Yes, sir.

THE COURT: You understand? You want to talk with your lawyer? You can do so. And I'm not necessarily telling you what to do.

DEFENDANT ROBERT PARKER: Yes, sir, I admit everything was fraudulent from the beginning, and we never intended to fund any of these deals.

(Cr-DE#300:43-44).

As is evident, the movant's admission during sentencing are

38

consistent with the statements he voluntarily made to the FBI following his conviction but prior to sentencing. (Cv-DE#12).

Under these circumstances, no deficient performance or prejudice has been established arising from counsel's failure to pursue these claims. Thus, he is entitled to no relief.

In **claim 11**, the movant asserts he was denied effective assistance of counsel and his Sixth Amendment right to due process was denied when his attorney failed to present a good faith defense. (Cv-DE#1:34). Specifically, the movant argues he advised counsel that the attorney for Parker Leasing & Financing Service had advised the owner and operators of the company that their activities were legal. (Id.).

"Good faith has long been recognized as a complete defense to charges involving an intent to defraud." United States v. Lewis, 592 F.2d 1282 (11th Cir. 1979); citing Durland v. United States, 161 U.S. 306, 313-14. "To succeed with a defense of good faith reliance on advice of counsel, the defendant must show that 1) he fully disclosed all relevant facts to his counsel and 2) he relied in good faith on his counsel's advice." United States v. Parker, 839 F.2d 1473 (11th Cir. 1988); citing United States v. Johnson, 730 F.2d 683, 686 (11th Cir), cert. denied, 469 U.S. 867 (1984); United States v. Smith, 523, F.2d 771, 778 (5th Cir. 1975), cert. denied 429 U.S. 817 (1976). In his motion to vacate, the movant fails to provide any support thereof. No mention is made that he fully disclosed all relevant facts to his counsel, thus failing to satisfy the first prong. Moreover, the movant fails to identify the attorney who allegedly provided the legal advice upon which he relied and aside from his vague assertions, he also fails to provide an affidavit from said attorney establishing the basis for

his belief in a good faith defense. Moreover, in light of failing to have any factual basis in support for a good faith defense, the Court nevertheless gave the jury a good faith defense instruction. (Cr-DE#232:27). Accordingly, even if counsel was deficient in failing to seek a good faith defense, the movant was not prejudiced.

Under these circumstances, no deficient performance or prejudice has been established pursuant to Strickland, supra, and the movant is therefore entitled to no relief on the claims.

In **claims 12 and 13**, the movant asserts he was denied effective assistance of counsel and his Sixth Amendment right to due process was denied when his attorney failed to provide any defense in the movant's case (Cv-DE#1:37) and when his attorney failed to conduct an adequate, meaningful and reasonable pre-trial investigation into the movant's case. (Cv-DE#1:40)

Specifically, with respect to **claim 12**, the movant argues counsel never conducted a meaningful investigation in which he could then formulate a strategy and determine not to call any witnesses or present a defense. (Cv-DE#1:37). In addition to the claims the movant has already raised in his motion to vacate, he further argues counsel should have had a thorough discussion with the movant concerning not presenting a defense. (Id.). Also, the movant informed counsel he desired an aggressive defense and had even presented counsel with a list of over 100 potential witnesses to contact; however, counsel failed to interview them. (Id.). Thus, the movant argues, his decision to forego presentation of a defense was not based on a meaningful investigation.

With respect to **claim 13**, the movant argues that counsel also

failed to conduct a meaningful pre-trial investigation, including interviewing potential witnesses and investigating the background of government witness Rocillo. (Cv-DE#1:40).

The movant's claim that counsel failed to discuss with him whether the defense should put forth a case is without merit as the trial records clearly reflect that counsel did in fact discuss the issue with the movant. (Cr-DE#307:898;Cr-DE#308:1055) Defense counsel, informed the Court that he disclosed a list of defense witnesses to the government, which included Ann Parker, Patrick Parker, William Parker, Jeff Thompson. (Cr-DE#305:1055,1056). As is evident from the foregoing exchange, the District Court made it clear to the movant that counsel was about to rest without presenting a defense, including the movant's right to testify. During this time, the movant had the opportunity, to voice his disagreement to the Court. (Cr-DE#305:1087). Instead, he acknowledged that the right to testify was his decision, one he waived and was satisfied with counsel's representation. (Id.). Accordingly, the movant's claim is without merit.

Moreover, the movant makes vague assertions without any support thereto. First, he fails to provide a list identifying the names of witnesses counsel failed to interview or call to testify at trial. Moreover, he has failed to demonstrate any prejudice he suffered as a result from counsel's failure to comply with his request as he has failed to not only provide affidavits from any of the alleged witnesses, but he has also failed to proffer the testimony that any one of them would have provided if called to testify.

The movant's assertion that a background investigation of Rocillo or a pre-trial interview would have resulted in additional

information, aside from information already contained in the PSI, which would have provided impeachment material is without merit. Moreover, the movant assumes that the government had favorable or Brady[9] material which counsel failed to request. However, aside from these vague assertions, the movant fails to demonstrate what impeachment material, if any, counsel could have discovered regarding Rocillo.

Although the movant also complains that counsel should have investigated the background of the other government witnesses in hopes of discovering impeachment material, this allegation is also insufficient to warrant consideration as the movant once again fails to present specific information that could have been acquired and how he suffered prejudice from counsel's failure to do so.

Under these circumstances, no deficient performance or prejudice has been established pursuant to Strickland, supra, and the movant is therefore entitled to no relief on the claims.

In **claim 14**, the movant asserts he is actually innocent. (Cv-DE#1:2;Cv-DE#4:11).

In Santos, the Supreme Court construed an ambiguity in the federal money-laundering statutes in favor of the defendants and overturned their convictions. United States v. Santos, __ U.S. __, 128 S.Ct. 2020 (2008). At issue was whether the term "proceeds" as employed throughout the statute meant "receipts" or "profits." See id. at 2024. Because the defendants had been convicted for transactions involving the receipts of illegal activity that were not the profits of that activity, the definition of the term was

---

[9]Brady v. Maryland, 373 U.S. 83 (1963).

central to the validity of their convictions. Writing for the
majority, Justice Scalia noted that profits and receipts were both
accepted synonyms for proceeds, and that the rule of lenity
required the resolution of this ambiguity in favor of the
defendants. See id. at 2025.

It is well established law in the Eleventh Circuit that it is
not ineffective assistance for an attorney to fail to foresee a
change in the law. See, United States v. Ardley, 273 F.3d 991 (11th
Cir.2001)(denial of suggestion for rehearing en banc)(our circuit
law completely forecloses the contention that an attorney's failure
to anticipate the Apprendi decision is ineffective assistance);
Spaziano v. Singletary, 36 F.3d 1028, 1039 (11th Cir.1994) ("We
have held many times that '[r]easonably effective representation
cannot and does not include a requirement to make arguments based
on predictions of how the law may develop.'"). Counsel was not
ineffective for failing to foresee the development in the law as
Santos was unsettled case law at the time his judgment was final.
Under these circumstances, the movant cannot establish prejudice
pursuant to Strickland arising from counsel's failure to raise a
Santos claim.

Moreover, in a recent case, the Eleventh Circuit held that the
Santos holding has "limited precedential value" and refused to
extend the holding to a money laundering case in which the proceeds
came from drug trafficking. United States v. Demarest, 570 F3d
1232, 2009 WL 1606937, *8 (11th Cir. June 10, 2009). "When a
fragmented Court decides a case and no single rationale explaining
the result enjoys the assent of five Justices, 'the holding of the
Court may be viewed as that position taken by those Members who
concurred in the judgments on the narrowest grounds . . . .'" The
narrow holding in Santos, at most, was that the gross receipts of
an unlicensed gambling operation were not "proceeds" under section

43

1956, but there is no evidence that the funds Demarest laundered were gross receipts of an illegal gambling operation. The evidence instead established that the laundered funds were the proceeds of an enterprise engaged in illegal drug trafficking. Id. (quoting Marks v. United States, 430 U.S. 188, 193 (1977)). Accordingly, because the laundered funds in the underlying criminal proceeding were not proceeds of an illegal gambling operation, but rather funds as a result of wire and mail fraud, the holding in Santos is inapplicable pursuant to the Eleventh Circuit's holding in Demarest, supra.

Moreover, to the extent the movant argues he is actually innocent, this claim is without merit. A habeas petitioner attempting to establish "actual innocence" must meet a high standard. Bousley v. United States, 523 U.S. 614 (1998). The movant must demonstrate that "in light of all the evidence, 'it is more likely than not that no reasonable juror would have convicted him.'" Bousley, supra at 623, quoting, Schlup v. Delo, 513 U.S. 298, 327-328 (1995). The Court emphasized that actual innocence means factual innocence, not mere legal insufficiency. Id. See also High v. Head, 209 F.3d 1257 (11th Cir. 2000); Lee v. Kemna, 213 F.3d 1037, 1039 (8th Cir.2000); Lucidore v. New York State Div. of Parole, 209 F.3d 107 (2nd Cir. 2000); citing Schlup v. Delo, 513 U.S. 298, 299, (1995); Jones v. United States, 153 F.3d 1305 (11th Cir. 1998)(holding that appellant must establish that in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him). To be credible, a claim of actual innocence requires the petitioner to "support his allegations of constitutional error with new reliable evidence--whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence--that was not presented at trial." Schlup v. Delo, 513 U.S. at 324. All things considered, the

evidence must undermine the Court's confidence in the outcome of the trial. Id. at 316. The movant fails to provide any facts to support his claim of actual innocence. Thus, no such showing of actual innocence has been made here.

In **claim 15**, the movant asserts he was denied effective assistance of counsel and his Sixth Amendment right to due process was denied when his attorney failed to object to the government's inappropriate use of expert testimony. (Cv-DE#1:46). According to the movant, Joanne Leavitt provided an opinion as an expert witness and not as a lay person when she testified during trial that the movant received taxable income. (Id.). In support of this, the movant argues that Leavitt was qualified as an expert when she made it known to the jury that she was a "Certified Fraud Examiner." (Id.). Moreover, the movant argues Leavitt improperly testified that he did not file a tax return, testimony which was improper because Gloria Jackson had already testified similarly. (Id.).

Likewise, the movant contends the government could have presented evidence that his co-defendant received a check usually within a week of the time Parker Leasing & Financing Service received a wire transfer, instead of having Leavitt testify to same. (Cv-DE#1:46). Finally, he argues counsel was deficient in failing to request a written summary of Leavitt's testimony prior to the commencement of trial. (Id.).

The underlying criminal records reflect that defense counsel informed the court that Leavitt had been present throughout trial and he was led to believe that she was not going to render an opinion and would just be a summary witness. (Cr-DE#307:899-903). After discussion, the Court stated the parties agreed that Leavitt's testimony would be limited to records that had been

45

admitted and not about other witnesses' testimony. (Id.:903). The Court further limited Leavitt's testimony to the review of the records which had been made available to the defense. (Id.:904).

Leavitt testified according to the parameters set forth by the Court's rulings. (Cr-DE#308:968). However, during moments which it appeared that Leavitt's testimony was in the form of an expert opinion, counsel for the movant's co-defendant, Gary Parker, objected. (Cr-DE#308:968,977,981). Accordingly, it was unnecessary for the movant's attorney to also object when the record clearly reflects that any improper testimony was objected thereto.

Likewise, it appears the movant takes issue, not with the information provided, but rather the source of the testimony. The fact that the government would have been able to introduce the same evidence refutes any inference of prejudice.

Finally, the movant's allegation that defense counsel failed to request a summary of Leavitt's testimony is without merit as the record clearly establishes that the defense had in fact been provided a summary. (Cr-DE#307:903).

In **claim 16**, the movant asserts he was denied effective assistance of counsel and his Sixth Amendment right to due process was denied when his attorney failed to object to the variance between what was in the indictment and what was proven at trial. (Cv-DE#1:48).

An accused has a constitutional right to a notice of the case the prosecution will present at trial. Kotteakos v. United States, 328 U.S. 750 (1946). The Eleventh Circuit has established a two step inquiry when considering allegations of variance between

indictments and proof at trial: (1) the Court must first determine whether material variance did indeed occur, and, if so, (2) whether the defendant suffered substantial prejudice as a result of the variance. United States v. Prince, 883 F.2d 953, 959 (11th Cir. 1989); See also: United States v. Reed, 980 F.2d 1568, 1581 (11th Cir. 1993).  To establish such prejudice, the defendant must show that "the proof at trial differ[s] so greatly from the charges in the indictment that the defendant was unfairly surprised and had an inadequate opportunity to prepare a defense.  United States v. Caporale, 806 F.2d 1487, 1500 (11th Cir. 1986).

A "constructive amendment" or "fatal variance" to an Indictment occurs when the government, through its presentation of evidence or its argument, or the district court, through its instructions to the jury, broadens the possible bases for conviction beyond that contained in the Indictment.  United States v. Castro, 89 F.3d 1443, 1452-53 (11th Cir. 1996). "[N]ot all differences between an indictment and the proof offered at trial, rise to the 'fatal' level of a constructive amendment." United States v. Randall, 171 F.3d 195, 203 (4th Cir. 1999).

A legally significant variance occurs when the evidence proves facts which are materially different from those alleged in the indictment. United States v. Ramos-Oseguera, 120 F.3d 1028 (9th Cir. 1997). The Court must determine whether the movant was convicted of an offense not charged in the Indictment.  United States v. Behety, 32 F.3d 503 (11th Cir. 1994); United States v. Artrip, 942 F.2d 1568, 1570 (11th Cir. 1991). A variance between what is alleged in the charging document and the proof at trial is immaterial where there is no prejudice to the defendant. Isom v. State, 387 So.2d 529 (Fla. 3 DCA 1980).

47

The jury was properly instructed on the elements the government needed to prove in order to convict the movant. In this case, no showing has been made that the movant was convicted of uncharged conduct as it relates to the charged offense, nor has he established that a constructive amendment or variance occurred in this case. Under these circumstances, no prejudice has been established pursuant to <u>Strickland</u> and the movant is thus entitled to no relief on the claim.

In **claim 18**, the movant asserts he was denied effective assistance of counsel and his Sixth Amendment right to due process was denied when his attorney refused to obtain an expert witness to testify at the movant's trial. (Cv-DE#1:54).

The movant contends that he continuously requested his attorney to obtain an expert witness to testify at trial. (Cv-DE#1:54). The movant maintains that an expert would have testified concerning common industry practices for the leasing industry. (<u>Id.</u>). According to the movant, the contracts entered into required the applicants to provide a letter of credit to Parker Leasing & Financing Service prior to receiving their funding and failure to provide said letter resulted in forfeiture of the applicant's deposits. (<u>Id.</u>). An expert witness would have testified that it was common industry practice that if an applicant failed to provide any item required by the contract, such deposits were forfeited. (<u>Id.</u>). Likewise, the movant provided counsel with the name of an expert, Steve Geller, a leasing consultant of Leasing Solutions, LLC. (<u>Id.</u>).

However, the movant has failed to provide any affidavit from Geller that he would have testified as proffered. Moreover, the movant has also failed to show that even if Geller had testified as

proffered, that the guilt phase portion of his trial would have been different.

Moreover, one can only speculate how the proffered testimony of this witness would have altered the outcome of the proceedings. Even if we credit the movant's testimony and find counsel's representation deficient for failing to interview and call Geller to rebut the government's theory, the movant is still entitled to no relief on the claim because he cannot satisfy the Strickland prejudice prong. The record reveals that the movant's defense throughout trial relied upon the premise that various deals were not funded because the applicants failed to comply with the contract's requirement that a letter of credit be provided. Specifically, during both, opening and closing arguments, defense counsel told the jury that they would not come across a contract where any of the applicants met their burden. (Cr-DE#304:26-27; See generally Cr-DE#309:1151-1189). Moreover, defense counsel thoroughly cross-examined the victim/witnesses based on this theory of defense when each of them acknowledged that the contract required them to provide a letter of credit, among other things. (Cr-DE#305:124-125,127,129,132,134-142,147-149,151-153,199-206,212,317-319,322,325-336; Cr-DE#306:419-423, 429-430, 436-446, 489,491,495-500,507-511; Cr-DE#307:603-604,606-617,626-629; and Cr-DE#308:960-961). Under these circumstances, the movant has failed to establish prejudice arising from counsel's alleged deficient performance.

In **claims 20 and 21**, the movant asserts he was denied effective assistance of counsel and his Sixth Amendment right to due process was denied when his attorney repeatedly used the name Parker Financing and Leasing, Inc. when he should have said Parker Leasing & Financing Service. (Cv-DE#1:60). Moreover, the movant

asserts the government committed prosecutorial misconduct when it repeatedly used the terms "The Parkers" and "Parker Leasing" to manipulate the jury and the movant was denied effective assistance of counsel when his attorney failed to object to the government's misconduct thus causing the movant severe prejudice by both, the government's misconduct and counsel's ineffective assistance. (Cv-DE#1:63). Both of the allegations are without merit.

The movant argues it was important for counsel to distinguish to the jury the difference between the two companies, however, he fails to explain why or how counsel's use of the names interchangeably caused him any prejudice. (Cv-DE#1:60). He further argues, this error was "compound[ed]" when his co-defendant's attorney committed the same error. (Id.:61). Although the movant states he was "clearly prejudiced," as he does with all of his other claims, he, however fails to provide any specifics of how he was in fact prejudiced.

Assuming defense counsel was deficient when counsel repeatedly used the name Parker Financing and Leasing, Inc. when he should have said Parker Leasing & Financing Service, the movant's claim remains without merit. As the underlying criminal records reflect during opening argument, defense counsel distinguished the movant's company from his father's company:

> [A]ll of these people that [the government] is talking about, all of these people that [they] call victims had contracts with Robert Parker's father, a man named Oscar Parker, not with Robert Parker. They had a signator on the contracts with a man named Oscar Parker, not Robert Parker, and they had four, five, six-page specific lease agreements that set forth what they had to do to get financing.

(Cr-DE#304:27).

[Oscar Parker] paid for Robert's house basically. He paid for Robert's electricity. He paid for the pool. He paid for the plumbing. He paid for the electricity. Oscar would pay for everything. It was Oscar's money. It came from Parker Leasing and Financing Services. Oscar Paul Parker was 100 percent owner of it. [The government] keeps getting up and saying the Parkers this and the Parkers that. No, no, no, it's not the Parkers. It's Parker Leasing and Financing Services owned by Oscar Paul Parker.

And Oscar Paul Parker, you are going to see, is the one who entered into each one of these contracts. And when he got the money, he would spread it around.

(Cr-DE#304:34).

Parker Leasing, Inc. Was dissolved by the State of Florida as a corporation back in 2001, and [the government] knows that. And that's why [the government] keeps calling it Parker Leasing, because [it] knows that Parker Financing and Leasing, Inc. Ceased to exist back in 2001. And [the government] knows that Robert Parker's name is not on one single contract that he's going to bring to you over the next couple of weeks, not one. His name might be on one as a witness to somebody else's signature, but his name isn't on the contract as a signator, not once.

(Cr-DE#304:37,38).

Moreover, during closing arguments, defense counsel once again reminded the jury that although the indictment referred to Parker Leasing & Financing Services, it also mentions Parker Financing and Leasing, Inc., but the latter company, which the movant was president, never had any contracts or customers. (Cr-DE#309:1177).

As is evident, from the beginning, counsel apprised the jury that the government would try to confuse them by interchanging the names of the companies. Defense counsel further informed the jury

51

that Parker Leasing & Financing Service was the company which had entered into the contracts which were in dispute and the movant had nothing to do with said contracts or victims. Therefore, even if counsel is deemed deficient when he misidentified the name of the company the jury could not have been confused as it was made clear from the beginning of trial every defendant's identification and their involvement with the respective companies. Thus, the movant has failed to demonstrate any prejudice as a result therefrom.

The movant further argues defense counsel was deficient when he failed to object to the government's use of the terms "the Parkers" and "Parker Leasing," which resulted in manipulating the jury when the government combined the defendants and the companies together.

The movant fails to set forth an argument as to why, when charged with a conspiracy with his brother and co-defendant, Gary Parker, it was improper for government to refer to the defendant as "the Parkers." Moreover, the movant fails to demonstrate he was prejudiced in light of the District Court's instruction to consider each charge and the evidence presented in support thereof, separately, as well as to consider each defendant separate and individual. (Cr-DE#232:32, Instruction No. 17). "A jury is presumed to follow the instructions given to it by the district judge." United States v. Ramirez, 426 F.3d 1344, 1352 (11th Cir. 2005); citing United States v. Schlei, 122 F.3d 944, 983 (11th Cir. 1997). The movant has failed to demonstrate that despite the court's instruction, the jury failed to adhere thereto.

Moreover, the movant's claim that the government attempted to confuse the jury by using "Parker Leasing" to deceive the jury into believing that if any of the three companies, i.e. Parker Financing

and Leasing, Inc., Parker Leasing & Financing Service and Parker Leasing Service, committed an offense, then they all must have been involved is without merit. (Cv-DE#1:63). As may be recalled, the defendants, not the corporations were on trial. Moreover, despite any attempts to disassociate himself from any and all activities of Parker Leasing & Financing Service, the evidence adduced at trial, along with his admissions after conviction but prior to sentencing, established that the movant was involved in the fraudulent activities of that company. Thus, even had counsel objected to the government's use of the terms, the movant nevertheless fails to demonstrate that the outcome of the trial would have resulted in a different outcome. Accordingly, this claim is without merit.

In **claim 22**, the movant asserts he was denied effective assistance of counsel when his attorney failed to conduct a criminal background check, a civil background check, or any other type of background check to obtain information for the purpose of impeaching government witnesses. (Cv-DE#1:65).

This claim is a mere reiteration of the argument raised with respect to **claim 13** above, and should be denied for the reasons expressed therein.

In **claim 23**, the movant asserts he was denied effective assistance of counsel and his Sixth Amendment right to due process was denied when his attorney failed to present exonerating evidence developed from a prior civil suit involving movant and Parker Leasing & Financing Service. (Cv-DE#1:68).

The movant explains that he was involved in a civil lawsuit, filed by R.A. Wenham, wherein Parker Leasing & Financing Service and O. Paul Parker were also named defendants. (Cv-DE#1:68).

According to the movant, the facts of the civil suit were similar to those alleged in the movant's indictment and the activities occurred during the same time frame as the conspiracy alleged in the indictment. (Id.). In the civil lawsuit, when presented with the issue whether the movant was responsible for the activities which occurred at Parker Leasing & Financing Service and whether the activities constituted fraud, the jury found the movant not guilty. (Id.).

In the underlying criminal case, defense counsel's investigator informed the movant that the foreman of the R.A. Wenham trial would be subpoenaed to testify during the criminal case. (Cv-DE#1:68). However, after commencement of trial, defense counsel failed to produce the foreman as a witness, which according to the movant, ultimately resulted in prejudicial effects. (Id.).

Despite the movant's allegations that the testimony from a jury foreman, from a civil suit, would have exonerated him as well in the underlying criminal proceeding, this claim is without merit. The movant fails to proffer the statements the civil lawsuit jury foreman would have provided. Further, the movant also fails to provide any law in support of his argument. Bare and conclusory allegations of ineffective assistance of counsel which contradict the existing record and are unsupported by affidavits or other indicia of reliability, are insufficient to require a hearing or further consideration.

Moreover, a jury foreperson's testimony from a civil suit would not have had any relevance in the movant's criminal case due to the lessor standard of proof applicable to civil proceedings. Likewise, although the movant argues that the civil proceedings were similar to those in the criminal case, the movant has failed

54

to provide any support thereof.

Moreover, tactical or strategic choices by counsel cannot support a collateral claim of ineffective assistance of counsel. Finally, even if the witness would have testified, no showing has been made in this collateral proceeding that the outcome of the guilt phase portion of the movant's trial would have been different, especially in light of the facts adduced at trial. Clearly, the movant's contention when viewed in light of the evidence adduced at trial, would not have affected the outcome of the movant's criminal proceeding. Moreover, even if the movant had attempted to call the foregoing individual as a defense witness, no showing has been made that he would have testified as represented. Accordingly, this claim is without merit.

In **claim 24**, the movant asserts he was denied effective assistance of counsel and his Sixth Amendment right to due process was denied when his attorney failed to object to tape recordings admitted into evidence. (Cv-DE#1:70).

According to the movant, the government introduced a tape recording of a conversation between a government witness, Bennett McLawhorn, and the movant which McLawhorn secretly recorded about three years prior to trial. (Cv-DE#1:71). He contends that defense counsel failed to independently verify the date of the tape, the accuracy of the tape, or the authenticity of the tape and neither the recording equipment nor the tape were examined prior to trial. (Id.).

Despite the movant's assertions, counsel had no basis to object to the tape. As the court record indicates, before the tape was played, witness McLawhorn explained how the conversation was

recorded. (Cr-DE#305:242-246). Moreover, he obtained legal advice that it was legal to record the conversation in Alabama and he also identified the people whose initials appeared on the transcript of the recording for the benefit of the jury. (Id.).

As is evident from the trial record, witness McLawhorn, who made the recording and participated in the conversation, authenticated the tape. Accordingly, counsel was not deficient in failing to object to the admission thereof. Moreover, even had counsel objected thereto and the Court sustained said objection, the evidence presented at trial was so overwhelming against the movant that there is no reasonable possibility that the case would have resulted in a different outcome.

In **claim 25**, the movant asserts he was denied effective assistance of counsel and his Sixth Amendment right to due process was denied when his attorney failed to investigate whether the movant was properly indicted by at least twelve (12) members of the grand jury as required by Rule 6(f) of the Federal Rules of Criminal Procedure. (Cv-DE#1:73).

It is well settled law that an indictment carries with it a strong presumption of validity. United States v. Ward, 694 F.2d 654, 658 (11th Cir. 1983). Therefore, because the indictment was signed by the grand jury foreperson, the signature constitutes an attestation to the act of the grand jury and if the movant provides no credible evidence to indicate otherwise, the court must presume that the indictment was properly returned by the grand jury. Id. Accordingly, this claim is without merit and counsel was not deficient for failing to raise it.

To the extent the movant argues he is entitled to view his

56

grand jury voting record to ensure that at least 12 jurors did in fact vote to indict him on each count of the indictment, this claim fails to warrant relief. Aside from the strong presumption of validity, a grand jury proceeding is also accorded a presumption of regularity, which could only be dispelled upon particularized proof of irregularities in the grand jury process. United States v. R. Enters, Inc., 498 U.S. 292, 301 (1992). Accordingly, to be entitled to production, the defendant must show a particularized need for the documents that outweighs the public policy of grand jury secrecy. United States v. Warren, 747 F.2d 1339, 1347 (10th Cir. 1984). In this collateral proceeding, the movant has failed to meet his burden of showing a particularized need for the record of the concurrence of the grand jury's indictment of the underlying criminal case. Rather, it appears, he wanted counsel to engage in a fishing expedition in hopes of finding any irregularities with the Superseding Indictment on which to base a motion to dismiss, which is prohibited. See United States v. Kim, 577 F.2d 473, 478 (9th Cir. 1978). Accordingly, the movant has failed to demonstrate that counsel was deficient in failing to investigate whether or not the movant was properly indicted by at least 12 members of the grand jury and he has also failed to demonstrate any suffered prejudice as a result thereof.

## Evidentiary Hearing

Any request for an evidentiary hearing with respect to the foregoing claims should be denied. A hearing is not required on patently frivolous claims or those which are based upon unsupported, generalizations or affirmatively contradicted by the record. See Holmes v. United States, 876 F.2d 1545, 1553 (11th Cir. 1989), citing, Guerra v. United States, 588 F.2d 519, 520-21 (5th Cir. 1979). As previously discussed in this report, the claims raised are unsupported by the record or without merit.

Consequently, no evidentiary hearing is required.

<u>Conclusion</u>

It is therefore recommended that this motion to vacate be denied on the merits.

Objections to this report may be filed with the District Judge within fourteen days of receipt of a copy of the report.

Signed this 26th date of April, 2010.

_____
UNITED STATES MAGISTRATE JUDGE

cc:  Robert W. Parker, <u>Pro Se</u>
     Reg. No. 64893-004
     Federal Correctional Institution
     P.O. Box 779800
     Miami, FL 33177-9800

     Anne Ruth Schultz, AUSA
     United States Attorney's Office
     99 NE 4 Street
     Miami, FL 33132

     Thomas P. Lanigan, AUSA
     United States Attorney's Office
     500 E. Broward Boulevard
     7th Floor
     Ft. Lauderdale, FL 33394